IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| HERMAN QUINTANA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | EP-09-CV-110-KC |
| | § | |
| ADC TELECOMMUNICATIONS, INC., | § | |
| | § | |
| | § | |
| Defendant. | § | |

## ORDER

On this day, the Court considered Defendant's "Motion for Summary Judgment" ("Motion") (Doc. No. 25). For the reasons set forth below, the Motion is **GRANTED**.

I.   BACKGROUND

Defendant ADC Telecommunications, Inc. ("ADC"), a provider of communication infrastructure products and services, is a business organization headquartered in Minnesota. Def.'s Proposed Undisputed Facts ¶ 1 ("Def.'s Facts") (Doc. No. 25-1). It has a sales office located in Santa Teresa, New Mexico. *Id.* ¶ 2. Plaintiff Herman Quintana ("Quintana") is a resident of El Paso, Texas, who worked in that office as a sales representative for several months starting in March 2008. Pl.'s Factual App., Statement of Relevant Facts ¶¶ 1, 3, 8 ("Pl.'s Facts") (Doc. No. 26-1). Quintana was fired in September 2008, with ADC citing insubordination as the reason. *Id.* ¶ 9; Def.'s Facts ¶¶ 18-19. His duties were distributed among two other ADC employees – Edna Gonzales and Mario Nunez – and no direct replacement was hired to fill his position. Def.'s Facts ¶ 19.

ADC cites a number of instances of workplace friction between Quintana and other members of ADC staff in support of its assertion that it fired Quintana for insubordination. *See* Def.'s Facts ¶¶ 6-17.  While sometimes disagreeing over the characterization or importance of some of these incidents, Quintana does not dispute the basic fact that these incidents took place.  *See* Pl.'s Factual App., Resp. to [Def.'s] Proposed Undisputed Facts ¶¶ 6-17 ("Pl.'s Resp. to Def.'s Facts") (Doc. No. 26-1) (*e.g.* "Plaintiff does not dispute that he sent the described e-mail as a joke.  However, Plaintiff disputes that this incident had anything to do with his termination.").  Quintana asserts, though, that the real cause of his termination was national origin discrimination, and he sought administrative relief through the EEOC before eventually filing the instant suit seeking relief under the New Mexico Human Right Act ("NMHRA").  Pl.'s Facts ¶ 26; Def.'s Facts ¶ 20.  On February 26, 2010, after the discovery period ended, ADC moved for summary judgment.  *See* Mot.  Quintana then filed a Response, and ADC followed up with a Reply.  *See* Pl.'s Resp. to Def.'s Mot. for Summ. J. ("Response") (Doc. No. 26); *see also* Def.'s Reply to Pl.'s Resp. to Def.'s Mot. for Summ. J. ("Reply") (Doc. No. 29).  ADC also objected to some of the evidence that Quintana submitted in his Response.  *See* Def.'s Objections to Pl.'s Summ. J. Evid. ("Def.'s Evid. Obj.") (Doc. No. 28).

## II.  DISCUSSION

### A.  Standard

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Warfield v. Byron*, 436 F.3d

551, 557 (5th Cir. 2006). The substantive law identifies which facts are material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Ellison v. Software Spectrum, Inc.*, 85 F.3d 187, 189 (5th Cir. 1996). A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Ellison*, 85 F.3d at 189.

"[The] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323; *Wallace v. Texas Tech. Univ.*, 80 F.3d 1042, 1046-47 (5th Cir. 1996). If the moving party meets its initial burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). The nonmovant's burden may not be satisfied by "conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Warfield*, 436 F.3d at 557 (quoting *Freeman v. Texas Dep't of Crim. Justice*, 369 F.3d 854, 860 (5th Cir. 2004)). Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). "Inferences drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing" summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (ellipses in original). Thus, the ultimate inquiry in a summary judgment motion is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

B.      Analysis

1.      New Mexico employment discrimination law

The New Mexico Human Rights Act ("NMHRA") prohibits employment discrimination on the basis of, inter alia, national origin. N.M. STAT. § 28-1-7(A). Employees complaining of employment discrimination may sue their employers, and, when analyzing cases brought under NMHRA, New Mexico law has adopted the federal evidentiary framework promulgated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Smith v. FDC Corp.*, 787 P.2d 433, 436 (N.M. 1990) ("The evidentiary methodology adopted therein provides guidance for proving a violation of the New Mexico Human Rights Act."). At the same time, New Mexico courts have been keen to stress that, while federal precedent may be used to shed light on NMHRA, the state "has not adopted federal law as [its] own." *Id.*

The *McDonnell Douglas* framework is used to analyze a case of alleged discrimination where indirect evidence might support a finding of prohibited discrimination, even if no "direct proof" is available. *Id.* at 436 n.1. Accordingly, this framework may be bypassed in cases where "direct evidence of discrimination" is at issue. *Auguster v. Vermillion Parish Sch. Bd.*, 249 F.3d 400, 404 n.7 (5th Cir. 2001). Under the *McDonnell Douglas* three-step framework, the complaining employee must first establish a prima facie case of employment discrimination. 411 U.S. at 802. If a plaintiff succeeds in establishing a prima facie case, the burden then shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action taken. *Id.* Finally, assuming that the employer manages to make this articulation, the employee then has the "opportunity show that the [employer's] stated reason for [the adverse action] was in fact pretext." *Id.* at 804.

A prima facie case of employment discrimination requires the plaintiff to prove four elements: (1) that he or she belongs to a protected group; (2) that he or she was qualified for the job at issue; (3) that her or she suffered an adverse employment action; and (4) that he or she was replaced by someone outside the protected group, or otherwise subject to a double standard or discriminatory adverse treatment.[1]  *Id.* at 802; *see also Smith*, 787 P.2d at 437; *see also Bryan v.*

---

[1] ADC argues that, in national origin discrimination cases, the fourth element of the prima facie case can only be satisfied by showing that the plaintiff was replaced by an employee of a different national origin, and that alternative means of satisfying this element are not available. *See* Reply 1 ("Plaintiff's expanded version of the prima facie case, however, applies only to age discrimination cases. . . . In national origin / race-based Title VII termination cases, however, a plaintiff is required to establish the fourth element of a prime facie case by showing replacement with someone outside the protected category."). This is an incorrect statement of the law, as alternatives to the fourth element are available in non-age employment discrimination claims under both New Mexico and federal law. *See Smith*, 787 P.2d at 437 ("For example, a prima facie case [under NMHRA] can be shown absent a demonstration that the plaintiff was replaced by someone not in the protected class if he can show that he was dismissed purportedly for misconduct nearly identical to that engaged in by one outside of the protected class who was nonetheless retained." (citing *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 282-84 (1976) (race discrimination case))); *see also Rutherford v. Harris County*, 197 F.3d 173, 180 (5th Cir. 1999) (applying the age discrimination formulation, as set forth in an earlier appellate opinion, to a Title VII sex discrimination case).

The cases cited by ADC in support of its argument do not withstand scrutiny. *See* Reply 1-2 (citing cases). The omission of the discussion of other methods for satisfying the fourth element in *Martinez v. Yellow Freight System, Inc.*, 826 P.2d 962, 964 (N.M. 1992), hardly overturns *Smith*.  *Martinez* was actually quoting *Smith* with approval when it set forth the *McDonnell Douglas* elements. *See Martinez*, 826 P.2d at 964. Because *Martinez* turned on other issues, omitting a part of the fourth-element discussion cannot be considered an abrogation. *See id.* In *Turner v. Baylor Richardson Medical Center*, 476 F.3d 337, 345 (5th Cir. 2007), a white employee replaced a black employee, leaving no occasion to discuss the alternatives. In *Moore v. Duncanville Independent School District*, No. 09-10130, 2009 WL 5095831 (5th Cir. Dec. 21, 2009), the Fifth Circuit, after noting that the Hispanic plaintiff was in fact replaced by another Hispanic worker, found that the plaintiff had "presented no evidence which would challenge the district court's finding" that he had no prima facie

*McKinsey & Co.*, 375 F.3d 358, 360 (5th Cir. 2004). The Fifth Circuit has held that an adequate prima facie case "raise[s] an inference of unlawful discrimination" which then places a "burden of production" on the defendant to articulate a "legitimate, nondiscriminatory reason" for the adverse action. *Rutherford v. Harris County*, 197 F.3d 173, 180 (5th Cir. 1999).

If the employer meets this burden, the plaintiff can challenge the veracity and adequacy of the employer's proffered nondiscriminatory reason, in order to demonstrate that it is a mere pretext for unlawful discrimination. *See McDonnell Douglas*, 411 U.S. at 802. The plaintiff can attack the employer's reason by showing either (1) that the reason, and the purported facts underlying it, are simply not true; or, (2) that even though the reason and the facts behind it are true, the stated reason "is not the only reason" for the adverse employment action and that a "motivating factor" was the plaintiffs "protected characteristic." *Alvarado v. Texas Rangers*, 492 F.3d 605, 611 (5th Cir. 2007); *see also Saucdeo-Falls v. Kunkle*, 299 F. App'x 315, 323-24 (5th Cir. 2008). Though the first method of demonstrating pretext does not directly prove that discrimination was the reason behind the adverse action, the Fifth Circuit has held that

---

case. *Id.* at *2. This implies that the Fifth Circuit would admit further evidence, the only purpose of which would be to support an alternative theory.

ADC's misuse of *Fritz v. Mineral Wells Independent School District*, 275 F.3d 43, 2001 WL 1223765 (5th Cir. 2001) (unpublished opinion) is striking. That opinion does indeed state that the "fourth element the plaintiff must show in making her *prima facie* case [under the ADEA] is different from that under Title VII." *See* Reply 2 (citing *Fritz*, 2001 WL 1223765, at *3). However, it is plainly incorrect to argue that this case holds that alternative means to satisfy the fourth element under Title VII are unavailable. Indeed, when setting forth the elements of a Title VII claim sounding in sex and national origin discrimination, the *Fritz* Court stated that the fourth element of a prima facie case "is established when a plaintiff shows that . . . the adverse employment decision was *differentially applied to her*." *Id.* at *2 (emphasis added). Thus, the *Fritz* Court *endorses* a test which looks beyond replacement by someone outside the plaintiff's class, contrary to ADC's contention that such an expansive test is not available in non-age discrimination cases.

"[e]vidence demonstrating that the employer's explanation is false or unworthy of credence, taken together with the plaintiff's prima facie case" may support a finding of discrimination even "without further evidence of defendant's true motive." *Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir. 2003). As to the second method of showing pretext, *McDonnell Douglas* itself supports it, as there it was undisputed that the plaintiff had committed the bad acts cited by the employer as its reason for not rehiring him. 411 U.S. at 795-96, 803; *see also Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004) (holding that liability attaches in "mixed motive" cases, where at least one demonstrable motive of the adverse employment action is "animus" towards the protected characteristic of the plaintiff).

### 2. Quintana fails to set forth a prima facie case

Both ADC and Quintana agree that Quintana has adequately proved the first three elements of a prima facie case of national origin employment discrimination; that is, he was a member of a protected group, he was qualified for the job at issue, and he suffered an adverse employment action. *See* Mot. 3; *see also* Resp. 3. ADC argues, though, that Quintana cannot establish the fourth element because his "duties were assumed by employees of the same national origin as he." Reply 3. Quintana does not argue with the factual claim that his duties were assumed by other workers of Mexican origin. *See* Resp. 4. Thus, ADC has shown that one avenue of proving the fourth element of a prima facie case is indeed unavailable here; that is, showing that he was replaced by someone outside his protected category. But this showing has not foreclosed this fourth element entirely. Instead, Quintana can still satisfy the fourth element by other means. For example, he will satisfy it if he can show that a double standard of discipline applied to workers of Mexican origin. *See Smith*, 787 P.2d at 437 (stating that, under

New Mexico law, the fourth element of a prima facie case of employment discrimination can be satisfied by showing that a double standard of discipline was applied, even if the plaintiff cannot show replacement by a worker outside the protected class).

But Quintana does not attempt to show that a double standard was applied to workers of Mexican origin. Instead, to satisfy the other-means avenue, he argues that "the fourth element of the prima facie case is satisfied by evidence that an attitude of prejudice towards Hispanic persons pervaded Defendant's management, allowing a reasonable inference that Quintana's national origin was a motivating factor in the decision to terminate his employment." Resp. 4. Quintana attempts to demonstrate this pervasive attitude of prejudice by bringing evidence of several "racist" comments or statements made by three ADC employees. Resp. 4-5.

Quintana cites no law which demonstrates how an alleged "attitude of prejudice," supported by evidence of a number of workplace remarks, alone satisfies the fourth element of a prima facie case of employment discrimination. *See id.* The Court is only aware of a limited number of cases where this sort of evidence, alone, was considered a possible way to meet the fourth element. *See Brown v. CSC Logic, Inc.*, 82 F.3d 651, 655-56 (5th Cir. 1996); *see also Washington v. Valspar Indus. Coatings Group*, No. 01-60458, 2002 WL 753503, at *2 (5th Cir. Apr. 9, 2002); *see also Lopez v. Kempthorne*, No. H-07-CV-1534, --- F.3d ----, 2010 WL 174889, at *35 (S.D. Tex. Jan. 14, 2010) (citing *Brown*). More commonly, this sort of evidence is used either to show pretext, under the third step of the *McDonnell Douglas* framework, or it is used as direct evidence of discrimination entirely apart from the *McDonnell Douglas* framework. *See Laxton*, 333 F.3d at 583. Though Quintana criticizes the Fifth Circuit's "stray remarks" jurisprudence, that body of law – typified by the decision in *Brown* – is the only available support

for the contention that workplace remarks alone are enough to establish the fourth element of a prima facie case. *See* Resp. 5-6.[2] Because the fourth element of the prima facie case is the point at which actual discrimination is shown – differential treatment premised on an illegitimate basis – the evidence (here, the workplace remarks) must be sufficient to set up a plausible causal link between the protected characteristic and the adverse employment action. *See Kirby v. SBC Servs., Inc.*, 391 F. Supp. 2d 445, 454 (N.D. Tex. 2005) (holding, in an age discrimination case, that the law does not protect "employees from erroneous or even arbitrary personnel decisions, but only from decisions which are unlawfully motivated").

In *Brown*, the Fifth Circuit held that a plaintiff may satisfy the fourth element of a prima facie case of employment discrimination on the basis of workplace remarks alone, if those remarks amount to more than mere "stray remarks." 82 F.3d at 655-56. The four-part test set forth in *Brown* examines whether the remarks were: (1) related to the protected characteristic at issue, (2) proximate in time to the adverse employment action, (3) made by an individual with authority over the employment action at issue, and (4) related to the employment action. *See id.* at 655; *see also Auguster*, 249 F.3d 405.[3] A plaintiff must establish a particular link between the

---

[2] Quintana spends some time emphasizing that "the racist attitude displayed by the comments of Defendant's managers is evidence of their discriminatory intent." Resp. 6. There is no question that these comments can be used as evidence in some manner; the issue here is whether they alone can satisfy the fourth element of a prima facie case of discrimination – and if they can, under what test.

[3] The Fifth Circuit acknowledges that the Supreme Court once overturned a case involving its "stray remarks" jurisprudence. *See Auguster*, 249 F.3d at 405 (discussing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000)). But the Fifth Circuit held that the key issue that the Supreme Court discussed in *Reeves* was not the stray remarks jurisprudence, but the question of whether a plaintiff had to introduce further

remarks made and the actions taken.  The facts of the instant case are thus examined in light of this test.

Quintana cites the remarks of three ADC employees in an attempt to establish the fourth element of his prima facie case.  Resp. 4-5.  First, he cites the remark of Laura Burnison ("Burnison") who said that "the work ethic of Hispanic people in El Paso is pathetic," or words to that effect.[4]  Pl.'s Facts ¶ 7.  This statement was made by Burnison to another ADC employee, and overheard by Quintana, when members of the Santa Teresa office were in Minnesota for a training program.  *See* Herman Quintana Dep. 103:14-104-8, Dec. 1, 2009 ("Quintana Dep.") (Doc. No. 26-2).  While this statement satisfies the first and third factors of the *Brown* test, as it is related to the protected national origin characteristic at issue and was made by a person with authority over the adverse employment action,[5] Quintana points to no evidence which establishes that it satisfies the second or fourth factors.  Specifically, Quintana does not meet the second factor because he does not advise the Court of when the Minnesota trip took place and why its timing should be regarded as proximate to when the adverse employment action was taken.  *See*

---

additional evidence of discrimination after setting forth a prima facie case *and* showing that the proffered legitimate explanation was pretextual.  *Id.*  The Fifth Circuit had held that a plaintiff had to bring forward additional evidence.  *Id.*  The Supreme Court reversed, holding that a jury may be permitted to find for the plaintiff without any additional evidence.  *Id.*  The Fifth Circuit emphasized that *Reeves* did not "overrule our stray remarks jurisprudence" in any way relevant here.  *Id.*

[4]  The exact phrasing is in dispute, but the Court will assume for present purposes that the words could be fairly taken to disparage workers of Mexican national origin.  *See* Reply 1, 3.

[5]  ADC admits that Burnison was Quintana's supervisor and a person with relevant authority over his hiring and firing.  *See* Mot. 4.

Resp. 4 (no discussion of the timing of this statement). Nor does Quintana discuss how this comment is related to his firing, which is the fourth factor. *Id.* While a poor work ethic may be a sufficient reason to fire an employee, ADC never asserted that it fired Quintana because of a poor work ethic. ADC always cited insubordination, and communication or teamwork problems. Mot. 6. Thus, because Quintana has not established that Burnison's remark was proximate in time to his firing, or related to his firing, it does not contribute to finding that the fourth element of Quintana's prima facie case has been satisfied.

Second, Quintana cites the remark of Denise Anderson ("Anderson"), an ADC branch manager in Santa Teresa, who said that Mexicans in El Paso do not like to take showers. Resp. 4-5. Quintana also claims that she said, at other points, that Mexicans have a low work ethic, and that she could not find qualified employees to hire in the El Paso region "because that's how these Mexicans are down here," allegedly referring to drug addiction or criminal history. Pl.'s Facts ¶ 5; *see also* Decl. of Sylvia Morris ¶¶ 8-9, Mar. 8, 2010 ("Morris Decl.") (Doc. No. 26-4). Here again, the first element of the *Brown* test is satisfied, as these remarks concern individuals of Mexican national origin. The Court will also assume that the third element is also satisfied, notwithstanding ADC's averments to the contrary, because Anderson's job title of "branch manager" makes it at least facially plausible that she has some relevant authority over Quintana. *See* Mot. 7 (averring that Anderson did not have relevant authority over Quintana's employment). But the second and fourth elements are not satisfied here. There is no suggestion that any of Anderson's comments were made at a time proximate to Quintana's firing. Her remark about Mexicans and showering was made approximately two or three months before Quintana was fired. *See* Quintana Dep. 101:6-21. Quintana brings no evidence at all regarding the timing of

the other comments made by Anderson.[6]  *See* Morris Decl. ¶¶ 8-9.  Also, there is no evidence that these remarks were related to the employment action at issue.  As noted above, ADC cited insubordination, and communication or teamwork problems, in connection with Quintana's firing.  The issues of bathing, work ethic, drug addiction and criminal history are not related to the issues cited in connection with Quintana's firing.  Accordingly, these remarks do not contribute to finding that the fourth element of the prima facie case has been satisfied.

Finally, Quintana cites to the behavior of Kate Kittiko ("Kittiko"), Burnison's superior, to show that an attitude of prejudice pervaded ADC's office.  Resp. 4.  Specifically, he presents evidence showing that Kittiko treated Sylvia Morris with contempt after learning of Morris's Mexican background.[7]  *Id.*; *see also* Pl.'s Facts 6.  While Quintana does not cite a particular spoken remark made by Kittiko, the Court will analyze this evidence using the *Brown* test because the Court lacks any other basis upon which to consider its relevance.  But so viewed, the Court concludes that it also does not contribute to finding that a prima facie case has been made, because it again fails to satisfy the second and fourth factors of the *Brown* test.  Specifically,

---

[6] But even if it is assumed that these other comments *were* proximate in time to Quintana's firing, they still do not satisfy the fourth factor.

[7] ADC objects to this evidence, calling it "inadmissible anecdotal evidence," or "me too" evidence, which cannot, according to the Fifth Circuit, serve to establish a pattern or practice of discrimination.  *See* Def.'s Evid. Obj. ¶ 4 (*citing Wyvill v. United Cos. Life Ins. Co.*, 212 F.3d 296, 302 (5th Cir. 2000)).  The Court overrules this objection.  While anecdotal evidence culled sporadically from across a large company is an insufficient basis on which to establish a corporate custom or practice, evidence concerning the attitudes of a supervisor in Quintana's direct chain of command *is* relevant to the *Brown* test, as it concerns an individual with potentially some authority over his hiring and firing.

Quintana fails to establish that Kittiko's behavior was proximate in time to his firing, or that it was related to his firing in any particular way. Merely establishing that Kittiko possessed generalized negative attitudes concerning workers of Mexican origin is insufficient to satisfy the four factors of the *Brown* test.

Thus, for the reasons set forth above, the Court finds that Quintana has not established a prima facie case of national origin employment discrimination. Accordingly, unless he can bypass the *McDonnell Douglas* framework by establishing direct proof of discrimination, his claim does not survive summary judgment.

### 3. Quintana cannot establish pretext

Though the Court holds that Quintana cannot establish a prima facie case of employment discrimination, the Court also finds that, even if Quintana had managed to set forth such a case, his claim would fail under the next step of the *McDonnell Douglas* framework. Specifically, ADC has set forth a putatively legitimate non-discriminatory reason for Quintana's firing, and Quintana fails to show that this reason is mere pretext.

#### a. ADC's legitimate reason

ADC's proffered legitimate reasons for Quintana's firing are insubordination, as well as teamwork and communication problems. Mot. 5. Insubordination alone is a legitimate reason for firing an employee, according to a number of Title VII cases. *See Block v. Kelly Servs., Inc.*, 197 F. App'x 346, 349 (5th Cir. 2006) ("Obviously, insubordination can serve as a legitimate reason for an employer to take an adverse employment action against an employee." (citing *Aldrup v. Caldera*, 274 F.3d 282, 286 (5th Cir.2001)). Communication skills are another legitimate basis for making employment decisions. *See Grimes v. Texas Dept. of Mental Health*

*and Mental Retardation*, 102 F.3d 137, 143 (5th Cir. 1996).

### b. Pretext not shown by shifting reasons

Quintana first argues that ADC's failure to elaborate on its reasons for firing him at the time it did so, followed by ADC's more extensive elaboration offered during litigation, is proof that the stated reasons are mere pretext. *See* Resp. 9. It is well established that, when an employer offers shifting, inconsistent or conflicting reasons for its actions, such inconsistency may give rise to an inference of pretext. *See Wright v. West*, 505 U.S. 277, 296 (1992). But the reasons offered here by ADC are not inconsistent or conflicting; rather, ADC merely adds more detail, and additional consonant reasons, over time. *See* Reply 5; *see also Nasti v. CIBA Specialty Chems. Corp.*, 492 F.3d 589, 594 (5th Cir. 2007) (holding that an employer may add consistent reasons to a decision to fire an employee without giving rise to an inference of pretext). Quintana cites to *Stubbs v. Regents of the University of California*, No. S-06-CV-1-LKK/DAD, 2007 WL 1532148, at *12 (E.D. Cal. May 25, 2007), in an attempt to support his position. *See* Resp. 9. But that case *supports* the proposition that adding reasons for the adverse employment action does not give rise to an inference of pretext if the newly added reasons are consistent with the old ones. *See Stubbs*, 2007 WL 1532148, at *12 n.12. That opinion only added the narrower proviso, which does not affect the analysis in the instant case, that "if [a particular reason] was to form the central grounds for [an employee's] release, presumably some fact-checking would be appropriate," and that conversations with the employee would normally be a part of that fact-checking. *Id.* at *12 n.13. The lack of such fact-checking conversations could thus suggest pretext. *See id.* Here, there is no issue as to whether ADC was remiss in any of its fact-checking. Thus, Quintana is not entitled to the benefit of a presumption of pretext,

predicated on his employer offering shifting and inconsistent reasons.

### c. Pretext not shown by lack of formal discipline

Quintana also argues that ADC never subjected him to formal discipline over any of the issues it cited in connection with his firing, and that this suggests that the proffered reasons are mere pretext. *See* Resp. 8-9. While an employer's failure to adhere to its own established disciplinary policies provides supports an inference of pretext, there is no underlying duty on the part of an employer to enact a formal disciplinary process in the first instance. *See Bugos v. Ricoh Corp.*, No. 07-20757, 2008 WL 3876548, at *5 (5th Cir. Aug. 21, 2008) (citing *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 355 n.29 (5th Cir. 2005)). Thus, no inference of pretext arises when an employer imposes no formal discipline, in advance of firing, where the employer's policies do not call for it. *Id.* In the instant case, ADC avers that it has no formal disciplinary policy which covers the issues at stake in Quintana's firing. *See* Reply 5. Quintana cites no facts to support a contention that ADC had a policy which it ignored in his case. Accordingly, the failure to impose formal discipline in advance of firing does not give rise to an inference of pretext.

Quintana cites *Walther v. Lone Star Gas Co.*, 952 F.2d 119, 124 (5th Cir. 1992), in an attempt to support his theory that the lack of a disciplinary record supports an inference of pretext. *See* Resp. 8. But that argument reads too expansive a theory into *Walther*. Instead, *Walther* simply holds that the employer's failure to unearth in its own records *any* concrete evidence of an employee's shortcomings could support a jury finding that the shortcomings cited in litigation were mere pretext. 952 F.2d at 124 ("Lone Star did not point to any specific evidence in Walther's personnel file indicating any previous dissatisfaction with his

performance."). While records of workplace discipline are one source of evidence concerning employee shortcomings, they are not the only source. Indeed, while the instant case does not contain records of any formal disciplinary procedures, ADC liberally cites to concrete evidence concerning a number of specific episodes of workplace friction between Quintana and others at ADC, discussed further below, justifying its assertion that Quintana's performance was dissatisfactory. *See* Mot. 5-6; *see also* Def.'s Facts ¶¶ 6-17. Thus, Quintana cannot use the lack of a formal disciplinary record to support an inference of pretext, and ADC satisfies *Walther* by pointing to concrete evidence of Quintana's workplace problems.

### d.     Pretext not suggested by ADC's factual narrative

Quintana also argues that the facts surrounding his interactions with his co-workers at ADC, on their face, do not support ADC's contention that he was fired for being insubordinate and for having teamwork and communications problems. *See* Resp. 8-9 ("no reasonable person could find Quintana's statements to be insubordinate"). As discussed in detail below, the Court finds this argument unavailing; the facts related by ADC adequately and logically support their contention the Quintana was fired for the reasons given. Whether firing Quintana – as opposed to some other disciplinary approach – was the ideal course of action here is not the issue, as employment discrimination law is not meant to protect employees from erroneous or ill-considered employment decisions, only discriminatory ones. *See Kirby*, 391 F. Supp. 2d at 454.

ADC asserts that Quintana, over the course of his six-month tenure, had the following problems:

(1)     Quintana experienced a workplace conflict with his coworker Edna Gonzalez ("Gonzalez"), believing, among other things, that Gonzalez and other sales representatives had

formed a "clique" that was meant to exclude him. Def.'s Facts ¶ 6.

(2)     Quintana required the intervention of his supervisor, Burnison, in order to adequately resolve this conflict with Gonzalez. *Id.*

(3)     Quintana complained to ADC's human resources department about Burnison's handling of the Gonzalez dispute, as well as the underlying dispute itself, after arriving at the conclusion that Burnison had committed a "breach of trust" against him when communicating with Gonzalez during Burnison's efforts to resolve the aforementioned conflict. Quintana Dep. 61:19-65:18 ("Q. Did you want H.R. to get involved in the Edna [Gonzalez] situation, or did you want H.R. to get involved in your feeling that Laura [Burnison] had somehow breached your trust? A. Both.").

(4)     Quintana caused ADC's human resources department to expend time and effort in an attempt to track down, using some sort of forensic computer science method, whether the email he sent to Burnison on the subject of Gonzalez was in fact secretly forwarded by Burnison to Gonzalez, in breach of Quintana's trust. Quintana Dep. 78:6-85:8 ("She had some people in India trying to figure out how to do a search in Outlook [for the allegedly forwarded email], and they couldn't figure it out.").

(5)     Quintana had difficulty communicating smoothly with a more senior ADC employee named Judy O'Riley. Laura Burnison Dep. 80:24-81:11 ("Burnison Dep.") (Doc. No. 26-3).

(6)     Quintana came into conflict with another ADC coworker, Shannon Geraghty, regarding the protocol for contacting existing customers who were working with different account executives. Def.'s Facts ¶ 11.

(7)     Quintana engaged in a poorly-received joke, in which he modified an email to make it

appear as if ADC had purchased him a first class airline ticket, instead of a coach class ticket, and then forwarded said email widely. Def.'s Facts ¶ 13.

(8) When working from home one day, on account of illness, Quintana got into a dispute with a coworker, Mayra Rosales, about who would contact an existing customer about an equipment quote that had been requested. Def.'s Facts ¶ 14.

(9) When Burnison intervened in this dispute, Quintana sent her a series of email messages which she understood to be disrespectful and insubordinate. Def.'s Facts ¶ 16 (stating that one email from Quintana to Burnison contained a training slideshow on the "ADC Way," which, Quintana wrote, "is a pretty powerful message by ADC that inspired me when I read it. Maybe this needs to go out to our team so that we can embrace the concept of teamwork and customer service.").

Quintana never disputes these underlying facts. *See generally* Pl.'s Facts. While Quintana asserts, in connection with a number of these incidents, that the problems were "resolved" after Burinson's intervention, a resolved problem is not the same as a problem that never arose at all. *See*, *e.g.*, Pl.'s Facts ¶ 15, Pl's Resp. to Def.'s Facts ¶ 6. Quintana cites no rule of law which requires a court to view "resolved" problems any differently than "unresolved" ones when examining a situation for pretext. Indeed, the extra time and effort that goes into resolving personality problems is a corporate expense that an employer could justifiably wish to avoid. Quintana has not shown how the facts, related by ADC in support of the reasons it gave for his firing, fail to mesh with those reasons. Accordingly, he cannot show pretext on this basis either.

                        **e.**        **Same actor inference negates pretext**

While most inferences, on summary judgment, are to be drawn in favor of the party resisting summary judgment, the Fifth Circuit has recognized that the "same actor" inference may be drawn in favor of an employer-defendant moving for summary judgment in an employment discrimination case. *See Spears v. UTI Drilling Co.*, 337 F. App'x 416, 421-22 (5th Cir. 2009) (citing *Haun v. Ideal Indus., Inc.*, 81 F.3d 541, 546 (5th Cir. 1996)). In a case where the same supervisor is "involved in both" the hiring and firing of the employee in question, this inference creates a rebuttable presumption that ethnic or racial animus is not present. *Spears*, 337 F. App'x 421-22. Quintana argues that, because Burinson was not "exclusively responsible" for both Quintana's hiring and firing, the presumption is not available here. Resp. 10. But the law does not require exclusive responsibility for the presumption to apply. *See Spears*, 337 F. App'x at 417-18, 421-22 (holding that the same actor inference was available on summary judgment in a case where the supervisor involving in both hiring and firing was not exclusively responsible for both). Quintana admits that Burnison "was involved in both the hiring and firing decisions." Resp. 10. The undisputed evidence in this case shows that she carried the bulk of the decision-making authority as to both Quintana's hiring and firing, with other employees and the human resources department acting only as a secondary check. Pl.'s Facts ¶ 2 ("The decision to hire Quintana was made by Burnison, with input from Judy O'Reilly[.]"); *see also* Def.'s Facts ¶ 18 ("Burnison forwarded Plaintiff's emails to Ruff along with the recommendation to terminate Plaintiff's employment for insubordination."). Accordingly, the same-actor inference is available here, which weighs against a finding of animus or pretext. For this reason and the other reasons discussed above, the Court holds that, even if Quintana had set forth a prima facie case of discrimination, ADC has rebutted it by furnishing a legitimate reason for its actions, and

Quintana has not adduced evidence which suggests that this legitimate reason was mere pretext.

### 4. Quintana does not establish a direct evidence case of discrimination

The *McDonnell Douglas* framework is not the only way to make out a case of employment discrimination, and the Fifth Circuit has held that workplace remarks can support a direct evidence case of employment discrimination. *See Auguster*, 249 F.3d at 404 n.7 (holding that it can be "appropriate to analyze such comments as direct evidence of discrimination, apart from the *McDonnell Douglas* framework"). While Quintana does not argue that his case is one supported by direct evidence, the Court examines this possibility for the sake of completeness. The Court concludes, however, that Quintana does not have a direct evidence case which can survive summary judgment. Where workplace remarks are used as direct evidence, they are subject to the same "stray remarks" test that is used to ascertain whether they can satisfy the fourth element of a prima facie case in an indirect evidence situation. *Id.* at 404-05 (invoking the *Brown* test). As none of the comments cited by Quintana were deemed to satisfy the *Brown* test when it was applied above, the Court concludes that none of the workplace remarks cited by Quintana support a direct evidence case either.

## III. CONCLUSION

For the reasons set forth above, the Court **GRANTS** summary judgment in favor of ADC.

**SO ORDERED.**

The clerk shall close the case.

**SIGNED** on this 19th day of May 2010.

_____
KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE